AM Santos, Esq.
AM SANTOS LAW, CHTD.
Nevada Bar No. 11265
2620 Regatta Drive Suite 102
Las Vegas, NV 89128
Telephone: 702-560-2409
Facsimile: 702-543-4855
tony@amsantoslaw.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
******

ZOHA DEVELOPMENT, LLC, a Nevada limited liability company; RONALD SASSANO, an individual,

               Plaintiffs,

   vs.

MCIG, INC, a Nevada corporation; SCALABLE SOLUTIONS L.L.C., a Nevada limited liability company; MICHAEL HAWKINS, an individual; CARL G. HAWKINS, an individual; PAUL ROSENBERG, an individual; DOE Individuals 1-10; and ROE Entities I-X

               Defendants.

Case No.  2:18-cv-79

**COMPLAINT**

**AND**

**DEMAND FOR JURY TRIAL**

Plaintiffs, by their attorney, AM Santos of AM Santos Law, CHTD, hereby submit this Complaint (the "Complaint") against the Defendants named herein, and aver and allege as follows:

### I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this case involves alleged violations of federal securities law by the defendants including: Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Sections 5(a) and

(c) of the Securities Act [15 U.S.C. §77e(a) and (c)].

2.   This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

3.   Venue is proper in this Court pursuant to 28 U.S.C. §1401 and 28 U.S.C. §1391(a) because: (i) MCIG, INC. ("MCIG") and SCALABLE SOLUTIONS, L.L.C. ("Scalable") are business entities formed and organized in the State of Nevada and maintain/maintained business licenses in Nevada; (ii) one or more defendants either resides in or maintains executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Plaintiffs, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## II.   THE PARTIES

4.   Plaintiff ZOHA DEVELOPMENT, LLC (Zoha) is a limited liability company formed in Nevada, pursuant to Nevada law and conducts business, and maintains operations in here in Clark County, Nevada.

5.   Plaintiff RONALD SASSANO (Sassano) is an individual resident in Destin, Florida. and he is a controlling stakeholder in Zoha.

6.   MCIG, INC. (MCIG) is a corporation formed in Nevada, pursuant to Nevada law and conducts business, and maintains operations in here in Clark County, Nevada.

7.   SCALABLE SOLUTIONS, L.L.C. (Scalable) is a limited liability company

formed in Nevada, pursuant to Nevada law and conducts (or conducted) business, and maintains (or maintained) operations in here in Clark County, Nevada.

8. Upon information and belief, Scalable is no longer operational but is the predecessor entity to Grow Contractors, Inc. (GCI).

9. Upon information and belief, Scalable is or was, a subsidiary of MCIG.

10. Scalable appears to be in default status with the Nevada Secretary of State.

11. Defendant MICHAEL HAWKINS (M. Hawkins) is an individual and resident of Clark County, Nevada.

12. M Hawkins a controlling stakeholder in MCIG and Scalable.

13. M. Hawkins' conduct, including but not limited to his commission of several torts within the State of Nevada, resulted in harm to Nevada resident(s). This Court's exercise of jurisdiction is consistent with State and Federal Constitutions, and NRS 14.065. Moreover, Defendant conducted business in Las Vegas, and a substantial part of the events or omissions giving rise to this action arose in Clark County, Nevada.

14. Hawkins is the Chief Financial Officer for MCIG and serves as a director on the board for MCIG.

15. Defendant CARL G. HAWKINS (C. Hawkins) is an individual who, upon information and belief, is a resident of Jacksonville, Florida.

16. C. Hawkins purports to be general counsel for MCIG. His conduct, including but not limited to his commission of several torts within or touching upon the State of Nevada, resulted in harm to Nevada resident(s). This Court's exercise of jurisdiction is consistent with State and Federal Constitutions, and NRS 14.065. Moreover, Defendant conducted business in Las Vegas, and a substantial part of the events or omissions giving rise to this action arose in Clark County Nevada.

17. Defendant PAUL ROSENBERG (Rosenberg) is a controlling stakeholder in

MCIG, and Scalable.  His residence is unknown to Plaintiff,

18.   Rosenberg is the President, (Chief Executive Officer) and director for MCIG.

19.   Rosenberg's conduct, including but not limited to his commission of several torts within the State of Nevada, resulted in harm to Nevada resident(s). This Court's exercise of jurisdiction is consistent with State and Federal Constitutions, and NRS 14.065. Moreover, Defendant conducted business in Las Vegas, and a substantial part of the events or omissions giving rise to this action arose in Clark County, Nevada.

20.   The true names of Defendants DOES 1 through 10, inclusive, and ROE CORPORATIONS I through X, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiffs, who therefore sue such defendants by fictitious names, Plaintiffs are informed and thereupon allege that each of the defendants designated herein as a DOE or ROE CORPORATION is in some way responsible for the damages claimed by Plaintiffs herein. Plaintiffs will ask leave of this Court to amend this Complaint to insert the true names and capacities of Defendants DOES 1 through 10, inclusive and ROE CORPORATIONS I through X, inclusive, when the identities have been ascertained, to formulate appropriate allegations, and to join such Defendants in this action.

### III.   GENERAL ALLEGATIONS

#### A.   <u>The Consulting Agreement</u>

21.   MCIG and Sassano formed Scalable in Nevada, in and about March of 2016. At inception MCIG, received 40 membership units and Sassano, (through Zoha) received 20 units. ZOHA also received a ten-year option to purchase additional units to expire on March 6, 2026.

22.   The Board Resolution authorizing said option reads in part as follows:
  Pursuant to Nevada corporation and limited liabilities company

law, and the Membership Agreement of Scalable Solutions L.L.C., (the "Company") the undersigned being all of the members of the Company hereby waive notice, adopt the following resolution which was unanimously adopted and hereby consent to the taking of the actions therein set forth:

WHEREAS, the Company recognizes the time, effort, skills, marketing, and other services provided by Ronald Sassano, by and through ZOHA Development, LLC in the development of the Scalable Solutions business strategy, business model, and corporate identity; and,

WHEREAS, Ronald Sassano and ZOHA Development, LLC will continue to provide services on behalf of the Company as may be mutually agreed upon from time to time; and,

WHEREAS, the Corporation desires to appoint Ronald Sassano as the Chief Executive Officer of the Company; and,

WHEREAS, the Corporation desires to ensure Ronald Sassano and ZOHA Development LLC is properly incentivized to grow the business of Scalable Solutions through his contacts and expertise with a vested interest; and,

WHEREAS, the Corporation desires to provide ZOHA Development LLC with a ten (10) year option to acquire 50 membership units of Scalable Solutions, Inc., for the price of $50.00 raising the consolidated amount owned by Ronald Sassano and ZOHA Development LLC to 60 units of 100 authorized units [sic?].

23.    In March of 2016, MCIG entered into an agreement (the Consulting Agreement) with Sassano and Zoha so that MCIG could secure Sassano's services as General Manager for what MCIG intended to be the "the construction division" of MCIG in support of the cannabis and CBD industry in the State of Nevada.[1]

---

[1] MCIG press release quoting Paul Rosenberg, dated, October 25, 2016 and appearing on the internet on several websites, including, for example, https://www.smallcapexclusive.com/mcig-inc-otcmktsmcig-shares-30-gain-just-tip-iceberg/. See also, https://investorshub.advfn.com/mCig-Inc-MCIG-25691/ referencing MCIG's corporate profile reading: "mCig, Inc. [a] diversified company servicing the legal cannabis, hemp and CBD markets via its lifestyle brands. mCig has transitioned from a vaporizer manufacturer to industry leading large scale, full service cannabis cultivation construction company with its Scalable Solutions division currently operating in the rapidly expanding Nevada market.

24.     Specifically, Sassano provided Defendants with certain professional consulting services relating to construction site management and operations for a number of MCIG's client projects.

25.     MCIG intended to operate Scalable as a subsidiary with Sassano managing its construction projects.

26.     The term of the Consulting Agreement as bargained for by the parties was to commence on March 1, 2016 and was to continue for six months and thereafter, on a month to month basis.

27.     Sassano was to be paid in the form of MCIG common stock at a rate of $15,000.00 worth of MCIG to be issued to Sassano (or Zoha) each month for the term of the Consulting Agreement and thereafter for each month Sassano continued to work with Defendants.

28.     Article "4" of the Consulting Agreement addressed certain issues related to the termination of the Agreement.  Specifically, Article "4" of the Agreement states: "[A]t any time, either party may terminate, without liability, the Consulting Term for any reason. The Consultant shall provide the Company with 30 days prior written notice of such Consultant's intent to terminate this Agreement."

29.     Of further note, Article "6" of the Agreement, entitled "Independent Contractor Relationship" reads in its entirety, as follows:

> The Consultant is an independent contractor of Company and, except to the extent specified in this Agreement, Company may not control or direct the details and means by which Consultant performs its duties under this Agreement. This Agreement shall not create the relationship of employer and employee, a partnership or a joint venture. Neither the Consultant nor Company shall be deemed an agent of the other on account of this Agreement or the performance of any of their obligations hereunder. The Consultant does not have any authority to bind Company to any agreement or contract.

30.     At no point in time was Sassano an officer, director, or control person of MCIG.

31.     MCIG drafted, or caused to be drafted, the Consulting Agreement and explicitly admit as much at Article "6" of the Agreement.

32.     The Consulting Agreement was executed by MCIG and/or Scalable, by and through, Defendant Rosenberg as President, CEO, director of MCIG.

33.     In accordance with the terms of the Consulting Agreement, Defendant(s) issued Plaintiff(s), MCIG shares as follows:

| | |
|---|---|
| 3/31/16 | 375,000 shares of Common Stock |
| 4/30/16 | 403,226 shares of Common Stock |
| 5/31/16 | 441,176 shares of Common Stock |
| 6/30/16 | 365,854 shares of Common Stock |
| 7/31/16 | 416,667 shares of Common Stock |
| 8/31/16 | 517,241 shares of Common Stock |

34.     Ultimately, MCIG replaced Scalable as its construction subsidiary with a newly formed entity namely, GCI.[2]

35.     Plaintiff dutifully cooperated in transferring to GCI (from Scalable) any and all pending or prospective customers or clients.  Moreover, Plaintiff Sassano agreed to stay on with MCIG to shepherd the transition and serve said customers for the benefit Scalable and the other Defendants.

36.     Subsequently, Sassano continued to work for MCIG as an independent contractor and consultant for GCI in the very same capacity and was to receive shares of MCIG on the same terms as specified in the Consulting Agreement.

---

[2] Upon information and belief, some time in December 2016 - January 2017, Defendants began operating the "construction division" of MCIG under the corporate moniker of "Grow Contractors, Inc." which succeeded Scalable Solutions, LLC as an operating entity. Scalable appears to continue to exist as a business entity as of this writing, but it is in *default* status with the NVSOS.

**B.**     <u>**The MCIG Stock Option(s)**</u>

37.     On or about October 1, 2016 in remuneration for the considerable work performed by Sassano, Defendant(s) granted to Plaintiff(s) a stock option for his continued services managing construction projects for MCIG.

38.     On or about April 11, 2017, Defendant M. Hawkins sent Plaintiff(s) a copy of the Notice of Grant of Stock Option evidencing this. It afforded Plaintiff(s) to purchase up to 500,000 shares of Common Stock of MCIG (identified as Grant #20170002a).

39.     By April 11, 2017 the option had fully vested in favor of Plaintiff(s).

40.     The Grant of Option afforded Plaintiff(s) the right to a cashless exercise such that the total number of shares ultimately issuable to Plaintiff(s) under the Option would be reduced by the market value of those shares necessary to pay for exercise and Plaintiff(s) would receive the difference.

41.     On April 11, 2017, MCIG (through Defendant M. Hawkins sent to Plaintiff(s) via email (the "April Email") a fully executed Stock Purchase Notice of Exercise pre-addressed back to MCIG electing (irrevocably) to purchase 123,170 shares of the Common Stock of MCIG in a cashless exercise pursuant to the Notice of Grant (hereinafter referred to as "Stock Exercise #1").

42.     *Inexplicably*, MCIG had *back-dated* this Notice of Exercise as though it had been executed on November 11, 2016.

43.     Also on April 11, 2017, in the same email, MCIG sent Plaintiff(s) a second Stock Purchase Notice of Exercise pre-addressed back to MCIG electing (irrevocably) to purchase 376,830 shares of the Common Stock of MCIG in a cashless exercise pursuant to the Notice of Grant (hereinafter referred to as "Stock Exercise #2").

44.     MCIG also back-dated this second notice, this time using the date of April 10, 2017.

45.     As the manager of Zoha, Mr. Sassano duly executed the Notice of Grant as called for, as well as Stock Purchase Exercise #1 and the Stock Purchase Exercise #2.

46.     He dutifully remitted same to MCIG on that April 11, 2017.

47.     Yet, Defendants have since failed to issue these shares to Plaintiff(s).

48.     Since returning the executed documents described above, Plaintiff(s) have made *several* attempts, to ascertain the status of these shares and any stock certificates (totaling 500,000 shares of Common Stock of MCIG).

49.     As of the date of this filing, Plaintiffs have yet to receive any adequate response or explanation as to the delay; nor have they received these shares.

50.     In the April Email, M. Hawkins instructed Sassano to *sign the attached documents and return to me*.

51.     Mr. Sassano complied with this request even though the documents appear to have been backdated, bearing dates well before the date of the receipt of the April Email.

52.     It is likewise *peculiar* that the dates on the Notice of Grant, Stock Exercise #1 and Stock Purchase Exercise #2, as well as the date the documents were *actually* signed by Mr. Sassano and returned to MCIG, *precede* the end of MCIG's fiscal year of April 30, 2017.

53.     Notwithstanding, MCIG's Form 10-K Annual Statement for fiscal year ended April 30, 2017, fails to disclose any of this information and the underlying transactions giving rise to these agreement(s) and instruments.

54.     The Notice of Grant and the subsequent election(s) to conduct a cashless purchase of the 500,000 shares of MCIG go unmentioned in said filings before the Commission.

55.     Even if the physical certificates evidencing the securities were not then

issued (before the end of the fiscal year-end) these material transaction(s) should have been disclosed (at the very least as a subscription receivable) on MCIG's balance sheet, as well as in a note (or notes) to the financial statements.

56.     Setting aside the dates *artificially* crafted or concocted by MCIG in the above referenced documents, for purposes of Rule 144's[3] tacking rules giving rise to a safe harbor, as of October 11, 2017, the common stock underlying the execution of the option(s), by Mr. Sassano (on April 11, 2017) are now eligible to be issued without restrictive legend.

57.     MCIG still owes Plaintiff(s) a total of 500,000 shares of common stock which Defendants refuse to issue.

58.     These shares when issued, are immediately eligible for resale without restriction.

**C.     Defendants Impede Plaintiff(s) Efforts to sell MCIG Stock**

59.     Although Defendant(s) did in fact issue to Plaintiff(s) *some* of the stock they were obliged to, they have since engaged in a systematic effort to thwart any effort by Plaintiff(s) to sell these shares over the market or otherwise.

60.     To that end, Defendant(s) have concocted a series of ruses or artifice(s) calculated or devised to protect and manipulate the market for MCIG's common stock to the direct detriment of Plaintiff(s).

61.     For example, on or about June 6, 2017 via email, MCIG, through Rosenberg and R. R.  Hawkins, told Plaintiff Sassano (and several MCIG employees with MCIG shares) that MCIG management was *trying to push the company to new levels* and further, attempted to dissuade Plaintiff Sassano and MCIG employees with MCIG shares, from selling over the market so as to facilitate reach these *new levels*.

62.     In at least one email, MCIG, through Rosenberg and M. Hawkins wrote

---

[3] 17 C.F.R. § 230.144

Plaintiff Sassano the following: *You know how important the share price for [the] financial health of the Company is* suggesting that any sales over the market might adversely affect the very *financial health* of MCIG.

63.     In another scheme designed to prevent or preclude Plaintiff(s) from selling their shares, MCIG, through Rosenberg and M. Hawkins, notified Plaintiff Sassano of a newly adopted "policy" mandating that each employee or shareholder provide monthly account statements to management for any securities account holding MCIG shares and further, mandating that said individuals sign leak-out agreements.

64.     The apparent objective of said policy, was to limit sales (and thus the supply) of the stock on the market so as to affect its price on the market.

65.     Said conduct was no more than a thinly veiled ruse and an attempt to interfere with the free and fair operation of the market for these securities and appears precipitously close to bordering on market manipulation by a public company officer.

66.     In and about  June of 2017, Rosenberg attempted to cajole Plaintiffs into signing a sign a leak-out agreement and recruited others (intermediaries)  to reach out to Plaintiff Sassano and persuade him accordingly.

67.     This was a blatant effort to limit sales of any MCIG stock and control or manipulate the market for same.

68.     Moreover, Defendant Rosenberg asked that Plaintiffs not sell any stock into the market "right now" as MCIG was working with an *investment banker* referred to by Defendant(s) as "Michel".

69.     Defendant(s) claimed that "Michel" was *sitting on the bid price,* through his *family office* to *help support the stock price.*

70.     Upon information and belief, Defendant Rosenberg expressed to several others, considerable consternation and concern as to Plaintiffs' prospective sales of MCIG stock over the market.

71.    Mr. Rosenberg further elaborated, admonishing Mr. Sassano that: *any selling would damage the Company's stock, and the Company would lose [the stock promoter] and the benefit of his efforts to support the bid.*

72.    Plaintiffs refused, thus did not sign the leak out agreement.

73.    These statements, when viewed through the lens of the June 6 email, suggest conduct on the part of MCIG management likely to run afoul of state and federal securities laws and the rules and regulations as promulgated thereunder.

74.    When these efforts failed to dissuade Plaintiff(s) from exercising the right to sell the subject securities; when Defendants could not persuade or cajole Plaintiffs to hold off on selling stock, MCIG, Rosenberg, and M. Hawkins employed yet another scheme or artifice, and adopted yet another pretext.

75.    This time, on June 19, 2017, Rosenberg notified Plaintiff(s) by way of email, that MCIG legal counsel had revisited the company's filings as an issuer reporting with the Securities and Exchange Commission (the "SEC") in tandem with the MCIG's disclosure policies and protocols for identifying *issuer affiliates* or control person(s).

76.    Rosenberg claimed that MCIG legal counsel had *suggested* that *all key personnel* of GCI should henceforth be listed as affiliates of MCIG.

77.    Of course, by doing so, MCIG, M. Hawkins and Rosenberg could secure the objective they intended from the outset.  Namely, they could thwart or limit Plaintiffs from rightfully selling their MCIG shares.

78.    On July 21, 2017, MCIG, through Rosenberg, emailed Plaintiffs *cc'ing* multiple third-parties including securities intermediaries (Plaintiffs' securities broker and brokerage firms and MCIG's transfer agent) in a blatant effort stop or certainly hinder or delay Plaintiff(s) efforts to sell any MCIG shares over the market.

79.    That email reads in part as follows:

Please be advised that it is the Company's intention to list Ronald Sassano as a company [MCIG] insider in its upcoming Annual Report Form 10-K filing. While Mr. Sassano does not qualify as an "Affiliate" insider pursuant to Rule 144 of the Securities Act of 1933, we have concluded that Mr. Sassano may be aware of material non-public information (and, as such, any trades made would be subject to the limitations of insider trading federal limitations). We recently learned that Ronald Sassano was the managing director of MacMas Real Estate and Agriculture Private Equity Opportunity 2 Fund, LLC, which the Company contracted to manage its subsidiary, Grow Contractor's Inc., which represented approximately 33% of the Company's total income for FY 2017. As such, the subsidiary and its management would have ongoing access to material non-public information. I believe Mr. Sassano may have failed to disclose that he was the managing director and a beneficiary of MACMAS when providing information to obtain releases of his stock under Rule 144. We rescind all documents signed by the Company authorizing the prospective sale of any stock under Rule 144 that does not list him as possessing material non-public information.

80.    By mischaracterizing Plaintiff as a Schedule 16 insider or affiliate, Defendants have harmed Plaintiffs without justification or cause.

81.    In the last Form 10-K Annual Report for the fiscal year ended April 30, 2017, Defendants blatantly misrepresent Plaintiff Sassano's status as a shareholder.

82.    Defendants have willfully abused and contorted Section 16 (15 USCS §78p) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

83.    They have done the same with respect to Title 17, Chapter II, Part 240) (§240.10b5-l) and those provisions addressing the concept of *Non- Statutory Insider(s).*

84.    Defendants' conduct has resulted in *significant harm* to Plaintiffs and Defendants' abject refusal to mitigate said harm, has compounded matters.

85.    Indeed, from the outset, Defendants MCIG, M. Hawkins and Rosenberg conspired to cajole and induce Plaintiffs into accepting the securities at issue as consideration for the bargain, lulling Plaintiffs into believing that they might be sell said securities without impedance, save for those rules and regulations germane to the

resale of restricted securities.

86.     Plaintiffs relied on Defendants' representations, unaware of intentionally surreptitious omissions, namely, that Defendants would never allow Plaintiffs to sell said securities except at the whim and pleasure of M. Hawkins and Rosenberg.

87.     Meanwhile, upon information and belief, M. Hawkins and Rosenberg have each enjoyed a personal pecuniary benefit from the sale of MCIG's stock over the market whilst impeding any sales form its employees and other shareholders, including Plaintiffs, thus engaging in brazen self-dealing to the detriment of Plaintiffs.

**D.     The Fiduciary Duties of M. Hawkins and Rosenberg as Directors and/or Officers.**

88.     As directors and officers of MCIG, these defendants owed fiduciary duties of candor, good faith and loyalty to Plaintiffs as shareholders. They are prohibited from engaging in self-dealing as well as any other unlawful, corporate conduct, including but not limited to violations of the laws, rules and regulations applicable to MCIG and its corporate governance protocols as dictated by Chapter 78 of the Nevada Revised Statutes[4] and its articles and bylaws.  Likewise, they are charged with dutifully obliging federal law and the rules and regulations as promulgated by the Securities and Exchange Commission with respect to publicly traded or listed issuers reporting with the Commission.   Most certainly, willful intentional misconduct (false filings) constituting fraud and other malfeasance evidences an express abdication of these fiduciary duties.

89.     Because of their positions of control and authority as directors and/or officers of MCIG, The Director-Defendants named herein exercised and continue to exercise control over the wrongful acts complained of herein and continue to harm

---

[4] NRS Chapter 78 - Private Corporations.

these Defendants particularly.

90.    Subsequent to multiple attempts to reach out to these Defendants in order to resolve this matter, (which efforts repeatedly failed given Defendants intractable position and abject refusal to comply with the Agreement(s) and the rules and regulations germane to these matters) Plaintiffs were forced to retain legal counsel.

91.    Legal counsel for Plaintiff sent MCIG a letter detailing their assessment of the issues germane to this dispute and Plaintiff's position.

92.    Notwithstanding, counsel for Plaintiffs suggested the parties meet (together with respective counsel to discuss these matters and, to the extent that Plaintiff might have misunderstood or miscommunicated, the relevant facts and circumstance to counsel, the lettered proffered MCIG and its officers, the opportunity to discuss and clarify same in an open and cordial, face-to-face, dialogue.

93.    Plaintiffs' counsel's suggestion was summarily rejected.

94.    Instead, said counsel received a letter in response to the gesture of good-faith discussions from Carl G. Hawkins (the captioned Defendant herein) whose letterhead purported, or suggested he was a licensed attorney and "General Counsel" to MCIG.

95.    C. Hawkins is M. Hawkins' son.

96.    C. Hawkins likewise claimed directly that he was legal counsel in a manner intended to suggest he was a licensed attorney.  His letter starts thusly:

> Mr. Santos,
> Please review the attached document.
> Please govern accordingly.
> Carl G. Hawkins, J.D.
> E-mail: ****@mciggroup.com Cell: ********[5]

---

[5] Redacted.

97.    It then includes the following boilerplate admonitions, (typically utilized by attorneys and law firms):

> This email transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential, privileged and/or proprietary information for the sole use of the intended recipient(s). If you are not an intended recipient or a person responsible for delivering it to an intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please: (1) immediately notify me by reply e-mail; and (2) destroy the original (and any copies) of this transmission and its attachments without reading or saving in any manner.

98.    The use of this boilerplate was a transparent effort to create the impression that the sender is legal counsel, and thus, duly licensed (in Nevada or in *some state)*.

99.    In the substance of his response, C. Hawkins simply rehashed Plaintiffs letter, ending each paragraph with the opposing conclusion as first posited by Plaintiff's counsel, thus claiming MCIG and the other Defendants herein conducted themselves appropriately and further, denying any claims that they engaged in any wrongful conduct.

100.    C. Hawkins was not in fact a licensed attorney.  In response to Plaintiff's query on this issue, C Hawkins explained that he had: (1) recently graduated from law school, (2) taken, (3) passed the bar exam in the State of Florida and finally, (4) was about to be sworn in.

101.    Over several other exchanges of emails, C. Hawkins continued to hold himself out as legal counsel to MCIG.

102.    In several SEC filings, it appears that M. Hawkins receives and continues to receive shares as part and parcel of the compensation package he put together for himself as a control person on the management team for MCIG.

103.   Upon information and belief C. Hawkins (like Rosenberg and his father or surreptitiously, through his father) receives MCIG shares (directly or indirectly).

104.   And too, like his father (and Rosenberg) C Hawkins enjoyed (and continues to enjoy) a personal pecuniary benefit from the sale of said MCIG stock over the market whilst participating in and/or aiding and abetting his cohort's scheme to impede any competing sales from MCIG employees and other shareholders, including these very Plaintiffs, thus engaging in brazen self-dealing and conduct tantamount to outright fraud, to the detriment of Plaintiffs.

105.   Defendants' conduct (each and collectively) is unconscionable.

106.   As a result of the actions and conduct of these Defendants, and the considerable harm they have visited upon Sassano and Zoha, Plaintiffs seek any and all remedies available to it resulting from the malicious and fraudulent unlawful and tortious conduct of these individual defendants in their individual capacities.

107.   Furthermore, Plaintiffs seek to recover the costs of suit, attorneys' fees and other incidental relief in connection with the following claims.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Breach of Contract

*(As to Defendants MCIG, Scalable, and GCI)*

1.   Plaintiffs repeat and incorporate all preceding allegations.

2.   Defendants MCIG, Scalable/GCI have willfully failed to abide by the explicit and implicit terms of the Agreement with Sassano and Zoha.

3.   These Defendants failed perform their respective duties under these terms including but not limited failing to deliver, in a timely fashion, the securities at issue.

4.   They failed to abide by the warranties and covenants and otherwise knowingly proffered covenants, warranties and representations they knew to be false

and upon which Plaintiffs relied as a condition to entering into the Agreement(s).

5.    Defendant(s) entered into binding agreement(s) Plaintiffs.

6.    Plaintiffs performed all the obligations required of them relative to the Agreement.

7.    Defendant(s) and/or their agents breached their duties and obligations owing to Plaintiffs under the Agreements by, among other things, failing to perform and by making warranties, covenants and representation(s) they knew to be false.

8.    These actions were in direct violation of the explicit and implicit terms of the Agreement(s) and constitute a material breach of same.

9.    Plaintiffs have been damaged by Defendant(s) breaches in an amount in excess of $75,000.

10.    Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorney's fees incurred herewith.

## SECOND CLAIM FOR RELIEF

### Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing

*(As to Defendants MCIG, Scalable)*

11.    Plaintiffs repeat and incorporate all preceding allegations.

12.    Defendant(s) failed to abide by the warranties and covenants they made in said Agreement(s) and otherwise knowingly proffered covenants, warranties and representations they knew to be false and upon which Plaintiffs relied as a condition to entering into the Agreement.

13.    Such tactics are not consistent with the contractual covenant of good faith and fair dealing.

14.    The implied covenant of good faith and fair dealing is required in every contract under Nevada Law.

15.    Defendant(s) and their agent(s) owed a duty of good faith to the Plaintiffs

16.    Defendant(s) and their agent(s) breached that duty by failing to perform in a manner that was faithful to the purpose of the Agreements by failing to comply with the terms of the Agreement, by knowingly making covenants, warranties and representations they knew to be false, and by failing to exercise diligent and good faith efforts on the Plaintiffs' behalf with respect to fulfilling their obligations under Agreement.

17.    The Plaintiffs' justified expectations were thus denied.

18.    The Plaintiffs have been damaged by Defendant(s)'s breaches of the implied covenant of good faith and fair dealing in an amount in excess of $75,000.

19.    Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorney's fees incurred herewith.

### THIRD CLAIM FOR RELIEF
### Securities Fraud 10(b); 10(b)-5
### Misrepresentation/Concealment

*(As to Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG)*

20.    Plaintiffs repeat and incorporate all preceding allegations.

21.    Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG perpetrated a scheme and artifice to misrepresent the nature of their dealings and transactions, all with the purpose of inducing Sassano and Zoha into entering into the Agreements and usurping unfettered control Scalable and its business and clients.

22.    M. Hawkins, C. Hawkins, Rosenberg and MCIG lulled Plaintiffs into accepting warrants, options or shares (securities) as payment, which securities Defendants led Plaintiff to believe could be sold over the market, subject only to a six-month holding period.

23.     From the outset, they never intended to allow, Plaintiffs to sell these shares and never intended to honor the options or warrants.

24.     Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG  willfully filed one or more periodic filings (Form 10-K) and other SEC filings (intermittent or current) which they knew to be false, misrepresenting or mischaracterizing Plaintiffs and their respective status in a concerted effort to prevent, preclude or restrict their ability to sell their shares.

25.     In willful and blatant disregard of corporate governance protocols and in blatant disregard for the truth, these Defendants falsely claimed Ron Sassano was a non-affiliate, or statutory insider, and filed false and misleading statements specifically to prevent Plaintiffs from selling so as to manipulate, protect or maintain the market for MCIG's common stock.

26.     M. Hawkins, C. Hawkins, Rosenberg and MCIG made or authorized these SEC filings and/or certified their accuracy notwithstanding their knowledge to the contrary.

27.     They had, as their ulterior purpose, to use their dominance and control over MCIG and its market for shares for their own ends and at the expense of Plaintiffs' interests.

28.     Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG, acting in their individual capacities and as agents of each other made false and misleading representations to Plaintiffs as detailed in the general allegations.

29.     Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG in willfully filing or causing to be filed, false periodic and intermittent reports with the Securities and Exchange Commission ("SEC") and thereafter, holding out said filings as true and materially accurate, also directly engaged in and/or aided and abetted the conduct of fraudulent securities transactions and the willful disregard of the recordkeeping and

internal controls provisions mandated by federal law and those applicable rules and regulations as promulgated by the SEC.  Specifically, these Defendants aided and abetted violations of Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)(2)], in violation of Section 15(b) of the Securities Act [15 U.S.C. §77o(b)].  In so doing, these Defendants breached their fiduciary duties to Plaintiffs and did so purposefully and specifically to so as to harm these Plaintiffs.

30.     Moreover, said Defendants directly engaged in (and/or aided and abetted each other, in conduct resulting in) violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. §240.10b-5(b)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

31.     They did so willfully, intentionally, and maliciously so as to harm these Plaintiffs.

32.     Finally, Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG, in willfully filing false periodic and intermittent reports with the SEC, directly engaged in and/or aided and abetted violations of 13(b)(2)(a) and (b), and 15(d) of the Exchange Act

33.      They failed in making and keeping (or otherwise falsified) books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the issuer and its assets particularly in relation to the Issuer's accounting for Plaintiff's securities and interests.

34.     They failed in devising and maintaining sufficiently accurate and truthful (or otherwise falsified) systems of internal accounting controls.  In so doing, these Defendants breached their fiduciary duties to Plaintiffs and did so purposefully and specifically to so as to harm these Plaintiffs.

35.     Plaintiffs relied on Defendants' representations (unaware of their falsity and surreptitious material omissions) by entering into the Agreement(s) and performing the

work as called for, as described in the preceding allegations.

36.     Plaintiffs' continued reliance on Defendants' material misrepresentations and omissions throughout, lulled them into a false sense of assurance.

37.     Said reliance was justified because Plaintiffs had no knowledge at the time that the representations were false, grossly misleading, or that material information had been concealed or mischaracterized or that Defendants had no intention to allow Plaintiffs to sell all of the shares over the market.

38.     Plaintiffs have been damaged by Defendants' fraud, misrepresentation and concealment in an amount exceeding $75,000.

39.     Defendants' *continued* fraud, misrepresentation and concealment is oppressive and/or malicious, willful and wanton and was motivated, in part, by Defendants' decision to further their own interests, which interests were in conflict with the Plaintiffs' interest. As such, Plaintiffs are entitled to an award of punitive damages.

40.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorneys' fees.

41.     Defendants made an untrue statements of a material facts and omitted material facts necessary under the circumstances to keep the statements that were made from being misleading in connection with their sale of securities to Plaintiffs.

42.     Defendants acted knowingly.

43.     The defendant used, or caused the use of an instrumentality of interstate commerce, (through emails and telephone) in connection with the sale of securities and made untrue statements and material omissions.

44.     The plaintiff justifiably relied on Defendants' untrue statement of a material fact unaware of omissions necessary to state a material fact in proffering consideration

or buying said securities; and

45.     The Defendants' misrepresentations and omissions caused Plaintiffs to suffer damages.

## FOURTH CLAIM FOR RELIEF
### Constructive Fraud
*(As to all Defendants)*

46.     Plaintiffs repeat and incorporate all preceding allegations.

47.     As fiduciaries Defendants M. Hawkins and Rosenberg owe Plaintiffs (as shareholders) a duty of candor and fully accurate and complete disclosures regarding MCIG and the subject securities.

48.     Defendant(s) perpetrated a scheme and artifice to misrepresent the nature of their dealings and transactions, all with the purpose of inducing Plaintiffs into entering into the Agreement and accepting the securities as remuneration.

49.     Defendants willfully filed false and misleading SEC filings.

50.     Defendants M. Hawkins and Rosenberg authorized the SEC filings and certified their accuracy notwithstanding their knowledge to the contrary.

51.     As described above, these Defendants made, or aided and abetted in the making of, misrepresentations and the concealment of material facts (tantamount to willful omissions of material facts) despite their duties to, inter alia, fully disclose the true facts.

52.     As a result of these Defendants' constructive fraud, Plaintiffs, sustained and will continue to sustain damages and injuries for which they have no adequate remedy at law.

53.     The acts of the Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud.

54.     Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

55.     It has been necessary for Plaintiffs retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy
*(All Defendants)*

56.     Plaintiffs repeat and incorporate all preceding allegations.

57.     Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG  acted in concert and with other common agents to exert dominion and control over Plaintiffs' MCIG securities and through such dominion and control, furthered the unlawful objectives under false pretense to further their own interests.

58.     Defendants M. Hawkins, C. Hawkins, Rosenberg and MCIG  furthered their own best interests as opposed to Plaintiffs' best as shareholders.

59.     As a result of the conspiratorial actions of Defendants, Plaintiffs have been damaged in excess of $75,000.

## SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
*(M. Hawkins and Rosenberg)*

60.     Plaintiffs repeat and incorporate all preceding allegations.

61.     Defendants M. Hawkins and Rosenberg, as officers and directors of MCIG owe Plaintiffs a fiduciary duty.

62.     Defendants breached their fiduciary duties by, among other things, failing to oblige their duties of care and loyalty to Plaintiffs as fiduciaries and making numerous untrue or misleading statements of material fact and omitting material facts in

connection with SEC filings and the initial Agreements both before and after its execution.

63.     Moreover, Defendants M. Hawkins and Rosenberg failed to exercise diligent and good faith efforts on behalf of CTI shareholders.

64.     Plaintiffs seek recompense in excess of $75,000 and other equitable relief as a result of Defendants' breach.

**SEVENTH CLAIM FOR RELIEF**

**<u>Breach of Duty of Care</u>**

*(M. Hawkins and Rosenberg)*

65.     Plaintiffs repeat and incorporate all preceding allegations.

66.     Defendants Hawkins and Rosenberg have a fiduciary relationship with Plaintiffs as officers and directors, and shareholders, of MCIG, respectively.

67.     Defendants M. Hawkins and Rosenberg had a duty of care with respect to their management of MCIG.

68.     These Defendants breached their duties to Plaintiffs by failing to exercise reasonable care with respect to said duties and refusing to honor or cooperate with presentment of the subject securities by Plaintiffs.

69.     Due to their actions, Plaintiffs have been damaged in an amount in excess of $75,000.

70.     Defendants Hawkins and Rosenberg respective breaches of this duty of loyalty were oppressive, fraudulent, and/or malicious.

71.     Plaintiffs are therefore entitled to punitive or exemplary damages.

72.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and attorney's fees incurred herein

### EIGHTH CLAIM FOR RELIEF

#### Breach of Duty of Loyalty

*(M. Hawkins and Rosenberg)*

73.     Plaintiffs repeat and incorporate all preceding allegations.

74.     Plaintiffs and Defendants M. Hawkins and Rosenberg have a fiduciary relationship with Plaintiffs as officers and directors and shareholders of MCIG, respectively.

75.     Defendants M. Hawkins and Rosenberg had a duty of loyalty with respect to their management of MCIG.

76.     Defendants breached their duties of loyalty to Plaintiffs by failing to exercise reasonable care and refusing to honor, or cooperate with presentment, of the subject securities by Plaintiffs.

77.     Defendants breached their duties to Plaintiffs by failing to exercise a reasonable degree of loyalty with respect to said duties.

78.     As a result of Defendants' actions, Plaintiffs have been damaged in an amount in excess of $75,000.

79.     Defendants' breach of their respective duties of loyalty was oppressive, fraudulent, and/or malicious.

80.     Plaintiffs are therefore entitled to punitive or exemplary damages.

81.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and attorney's fees incurred herein.

### NINTH CLAIM FOR RELIEF

#### Negligent Misrepresentation

*(All Defendants)*

82.     Plaintiffs repeat and incorporate all preceding allegations.

83.     Defendant(s), failed to exercise reasonable care or competence in assuring that its representations, warranties and covenants were true and reasonably accurate.

84.     Defendant(s) further failed to exercise reasonable care or competence by failing to inform Plaintiffs of any material inaccuracies.

85.     Defendants further failed to exercise reasonable care or competence by filing or causing to be filed materially inaccurate reporting documents for the sole purpose of injuring or harming Plaintiffs and forestalling their right to sell or alienate the subject securities over the market.

86.     Plaintiffs justifiably relied on Defendant(s)' representations in entering into the Agreement and performing the considerable work and services for the benefit of MCIG.

87.     Plaintiffs face the likelihood of substantial legal fees and securities intermediary fees to remedy the resulting damage caused by Defendants' conduct and the prospect of a falling market price for the shares Plaintiffs should have been able to sell over the market long ago.

88.     As a result of Defendant(s)' conduct; Plaintiffs have suffered actual harm and damages in excess of $75,000. Accordingly, Plaintiffs seek compensatory damages in excess of $75,000.

### TENTH CLAIM FOR RELIEF
### Declaratory Relief
*(All Defendants)*

89.     Plaintiffs repeat and incorporate all preceding allegations.

90.     Under N.R.S. §30.010 et seq., the Uniform Declaratory Judgment Act, any person interested under a written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a contract, may have determined any question of construction or validity arising under the contract and

obtain a declaration of rights, status or other legal relations thereunder.

91.     A justiciable controversy exists as Plaintiffs have asserted a claim of right to the shares as bargained for.

92.     Moreover, Plaintiffs assert they are not affiliates or statutory insiders.

93.     Defendants have thus far failed to concur.

94.     Accordingly, the controversy is between persons whose interests are adverse.

95.     Plaintiffs have legally protectable interests in the controversy, i.e., their equity ownership of their respective shares of MCIG and their right to more shares or securities and Plaintiffs' rights to sell said securities over the market.

96.      Defendants have conducted themselves as rogue officers and directors in contravention of their duties under Nevada Law.

97.     The issues involved in the controversy are ripe for judicial determination because there is a substantial controversy, among parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

98.     Plaintiffs therefore seek declaration(s) from this Court in favor of Plaintiffs as to these matters.

99.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorneys' fees incurred herein.

## ELEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
*(All Defendants)*

100.    Plaintiffs repeat and incorporate all preceding allegations.

101.    In the alternative, or to the extent this Court finds an absence of contract,

Plaintiffs request equitable relief.

102.     The fruit of Defendants' fraudulent acts of misrepresentation, omission and inducement constitute permanent and valuable benefits conferred upon Defendants for which Plaintiffs have not received the agreed upon benefits. Further, Defendants will be unjustly enriched by illegally and unlawfully misappropriating Plaintiffs services and work.

103.     If Defendants can retain these benefits without paying Plaintiffs, Defendants will be unjustly enriched in an amount in excess of $75,000, to be determined at trial.

104.     As a direct and proximate result of Defendants' unjust enrichment, as set forth above, Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to an award of reasonable attorneys' fees and costs incurred herein.

### TWELFTH CLAIM FOR RELIEF

### Alter Ego

*(All Defendants)*

105.     Defendant business entity MCIG is unduly and improperly influenced and governed by Defendants M. Hawkins and Rosenberg such that it is merely the alter ego of these individual defendants.

106.      Defendants M. Hawkins and Rosenberg, in their capacities and as officer and directors, have so blatantly disregarded the corporate form and corporate governance standards to their exclusive benefit and to the exclusion of others that there exists a unity of interest and ownership and the corporation(s) and person(s) are inseparable from another.

107.     The facts as known and to be discovered are such that adherence to the corporate fiction of a separate entity under the circumstances would sanction a fraud or promote injustice.

108.    Upon information and belief, these defendants have in engage in conduct including but not limited to: comingling of funds, failure to observe corporate formalities, loans to or from the corporation without sufficient consideration, and generally treating the assets of the corporation(s) as the assets of the person(s); and

109.    Recognizing any separate corporate existence, would bring about an inequitable result.

110.    As a direct and proximate result as set forth above, Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to an award of reasonable attorney's fees and costs incurred herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.  For relief as the Court may deem just and proper.

2.  For all costs and all attorneys' fees incurred and accrued in these proceedings.

Dated this 12th day of January 2018

A.M. SANTOS LAW, CHTD.

Antony M. Santos, Esq.
Nevada Bar No. 11265
2620 Regatta Drive Suite 102
Las Vegas, Nevada 89128
Telephone: (702) 560-2409
Facsimile: (702) 543-4855
tony@amsantoslaw.com

1

2

## **DEMAND FOR JURY TRIAL**

3

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

4

Dated this 12th day of January 2018

5

6                                              **A.M. SANTOS LAW, CHTD.**

7

8                                              Antony M. Santos, Esq.
                                               Nevada Bar No. 11265
9                                              2620 Regatta Drive Suite 102
                                               Las Vegas, Nevada 89128
10                                             Telephone: (702) 560-2409
                                               Facsimile: (702) 543-4855
11                                             tony@amsantoslaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28