AM Santos, Esq.
AM SANTOS LAW, CHTD.
Nevada Bar No. 11265
2620 Regatta Drive Suite 102
Las Vegas, NV 89128
Telephone: 702-717-0329
Facsimile: 702-543-4855
ams@lawlvnv.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

******

ZOHA DEVELOPMENT, LLC, a Nevada limited liability company; RONALD SASSANO, an individual,

                            Plaintiffs,

        vs.

MCIG, INC, a Nevada corporation; SCALABLE SOLUTIONS L.L.C., a Nevada limited liability company; MICHAEL HAWKINS, an individual; PAUL ROSENBERG, an individual; DOE Individuals 1-10; and ROE Entities I-X,

                            Defendants.

Case No.  2:18-cv-79

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs, by their attorney, AM Santos of AM Santos Law, CHTD, hereby submit this First Amended Complaint (the "Amended Complaint") against the Defendants named herein, and aver and allege as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this case involves an alleged violation of federal securities law by the defendants namely, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder,

2.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

3.    Venue is proper in this Court pursuant to 28 U.S.C. §1401 and 28 U.S.C. §1391(a) because: (i) MCIG, INC. ("MCIG") and SCALABLE SOLUTIONS, L.L.C. ("Scalable") are business entities formed and organized in the State of Nevada and maintain/maintained business licenses in Nevada; (ii) one or more defendants either resides in or maintains executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Plaintiffs, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## II.   THE PARTIES

4.    Plaintiff ZOHA DEVELOPMENT, LLC (Zoha) is a limited liability company formed in Nevada, pursuant to Nevada law and conducts business, and maintains operations in here in Clark County, Nevada.

5.    Plaintiff RONALD SASSANO (Sassano) is an individual resident in Destin, Florida. and he is a controlling stakeholder in Zoha.

6.    MCIG, INC. (MCIG) is a corporation formed in Nevada, pursuant to Nevada law and conducts business, and maintains operations in here in Clark County, Nevada.

7.   SCALABLE SOLUTIONS, L.L.C. (Scalable) is a limited liability company formed in Nevada, pursuant to Nevada law and conducts (or conducted) business, and maintains (or maintained) operations in here in Clark County, Nevada.

8.   Upon information and belief, Scalable is no longer operational but is the predecessor entity to Grow Contractors, Inc. (GCI).

9.   Upon information and belief, Scalable is or was, a subsidiary of MCIG.

10.   Scalable appears to be in default status with the Nevada Secretary of State.

11.   Defendant MICHAEL HAWKINS (M. Hawkins) is an individual and resident of Clark County, Nevada.

12.   M Hawkins a controlling stakeholder in MCIG and Scalable.

13.   M. Hawkins' conduct, including but not limited to his commission of several torts within the State of Nevada, resulted in harm to Nevada resident(s). This Court's exercise of jurisdiction is consistent with State and Federal Constitutions, and NRS 14.065. Moreover, Defendant conducted business in Las Vegas, and a substantial part of the events or omissions giving rise to this action arose in Clark County, Nevada.

14.   Hawkins is the Chief Financial Officer for MCIG and serves as a director on the board for MCIG.

15.   Defendant PAUL ROSENBERG (Rosenberg) is a controlling stakeholder in MCIG, and Scalable.  His residence is unknown to Plaintiff,

16.   Rosenberg is the President, (Chief Executive Officer) and director for MCIG.

17.   Rosenberg's conduct, including but not limited to his commission of

several torts within the State of Nevada, resulted in harm to Nevada resident(s). This Court's exercise of jurisdiction is consistent with State and Federal Constitutions, and NRS 14.065. Moreover, Defendant conducted business in Las Vegas, and a substantial part of the events or omissions giving rise to this action arose in Clark County, Nevada.

18.   The true names of Defendants DOES 1 through 10, inclusive, and ROE CORPORATIONS I through X, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiffs, who therefore sue such defendants by fictitious names, Plaintiffs are informed and thereupon allege that each of the defendants designated herein as a DOE or ROE CORPORATION is in some way responsible for the damages claimed by Plaintiffs herein. Plaintiffs will ask leave of this Court to amend this Complaint to insert the true names and capacities of Defendants DOES 1 through 10, inclusive and ROE CORPORATIONS I through X, inclusive, when the identities have been ascertained, to formulate appropriate allegations, and to join such Defendants in this action.

### III.   GENERAL ALLEGATIONS

#### A.   **About mCig**

19.   mCig, Inc. (mCig) is a penny stock enterprise, or microcap company.

20.   It was first incorporated in the State of Nevada on December 30, 2010. Since then, it has transformed itself a handful of times morphing from one business, and structure to the next, raising modest capital here and there in prevailing management's efforts to secure an operational foothold yielding consistent, positive cashflow and profits.

21.   mCig started life out Lifetech Industries, Inc.

22.   On August 2, 2013, Lifetech Industries, Inc. became "mCig, Inc."  and

transitioned its business focus to *vaporizer electronic cigarettes*, promoting its wares as "provid[ing] a smoking experience by heating plant material, waxes, and oils delivering a smoother inhalation experience.

23.   mCig in a prior interation, claimed its subsidiary, VitaCig, Inc. manufactured and sold a nicotine-free eCig[arette] that "delivers a water-vapor mixed with vitamins and natural flavors."

24.   Thereafter, mCig followed up on its foray into electronic cigarettes by adjusting its focus on yet another hot, and trendy business, namely marijuana and Cannabis oil extracts, claiming in its SEC filings that it had "positioned itself as a technology company focused on what it described the long-term secular trend of the "decriminalization and legalization of marijuana for medicinal or recreational purposes."[1]

25.   In its present form, mCig fashions itself a "cannabis" or "legal marijuana" enterprise.

26.   On its website, the company is described as follows:

> mCig, Inc. looks forward to growing its core competencies to service the ancillary legal Cannabis, Hemp and CBD markets, with broader expansion to take place once federal laws change. With over 100 years of experience combined between the key players and our grow contractors division, mCig, Inc. is proud to work with Cannabis Industry leaders and to provide broad and rounded solutions for consumer markets, legal growers and canna-businesses nationwide. mCig Inc. is a diversified and vertically integrated cannabis group committed to being the leading distributor of technology, products and services to fit the needs of the rapidly expanding cannabis sector.[2]

**B.   mCig's Penny Stock Savvy Management Team.**

27.   Defendants Rosenberg and Hawkins are seasoned penny stock[3]

---

[1]   https://www.sec.gov/Archives/edgar/data/1525852/000160987615000008/0001609876-15-000008-index.htm (mCig Form 10-K Item 1, at page 5.)

[2]   https://www.mciggroup.com/

[3] The term "Penny Stock" as described at Penny Stock, Practical Law Glossary Item 6-382-3681, refers to generally, low-priced (below $5, sometimes sub-penny) speculative equity

"players", intimately familiar with the market dynamics for thinly traded shares quoted on suspect, non-exchange, so-called "bulletin boards" and other microcap "markets".

28.   Pointedly, they are painfully aware of the fact that demand for microcap stock is rare and miniscule.

29.   In mCig's SEC filings, Defendants Rosenberg and Hawkins concede to this savvy, given the biographies they proffer the public.  These read as follows:

**Paul Rosenberg** was appointed as our Chief Executive Officer, Treasurer, Secretary, and Director of mCig, Inc. on May 23, 2013. For the past 5 years Mr. Rosenberg has been a private investor focusing on the technology space where he has over two decades of experience as a software engineer specializing in complex distributed systems in C++, Delphi, VB, Java, and Oracle DB projects via his consulting company: PR Data Consulting. Since 1997, Mr. Rosenberg has worked as an independent consultant with both private and public enterprises including:  The Federal Deposit Insurance Company (FDIC), The Zennstrom/Friis Group (Kazaa/Skype/Atomico Ventures), and Trust Digital (later sold to Mcafee in 2010), Dell, Inc., Boeing, and Microsoft Inc. as well as several other notable companies.

**Michael Hawkins** has been our Chief Financial Officer since April 8, 2016. Prior to fulfilling this role, Mr. Hawkins was the Managing Member of Epic Industry, LLC and the Chief Financial Officer for ICA Solutions, Inc.  Mr. Hawkins has worked in the hospitality and entertainment industry and construction industry, providing executive level services as CEO, CFO, and COO to multiple nanotech public and privately held companies.. Mr. Hawkins earned his B.S. in Computer Science and Business Administration from University of Maryland, University College.

30.   True to form, the third member of mCig's management team (not a party

---

securities of very small companies. While penny stocks generally trade over-the-counter (OTC), such as on the OTC Markets or the Over-the-Counter Bulletin Board Market, they may also trade on securities exchanges, including foreign securities exchanges. In addition, penny stocks include the securities of certain private companies with no active trading market. For the SEC definition of penny stock, see Rule 3a51-1 under the Exchange Act. Because penny stocks are considered to be speculative and high-risk due to their limited liquidity and other factors, penny stock issuers may not be able to rely on certain safe harbors and other accommodations available to other issuers.

to this action) likewise shares an intimate familiarity with the ins and outs of the penny stock world.  His bio reads as follows:

> **Alex Mardikian** has been our Chief Marketing Officer since April 1, 2017.  Alex Mardikian has an extensive background in manufacturing, marketing and sales, with 30-years of experience, which encompasses owning and operating his own successful companies, both in the private and public sectors, from Fortune 50 companies scaled down to start-ups, all of which he held a title.   This included his role as Western Regional Manager, Product Design and Certification, for Schlumberger Industries and as a founding principal of publicly traded company Sonic Jet Performance and Force Protection, publicly traded on the OTC and successfully listed and traded on the Nasdaq.  His success is warranted by communicating and achieving the value proposition of a company and / or product line, through gorilla marketing for global and exclusive licensing of Von Dutch, Ed Hardy, Quadrophenia with The WHO and the Grammy Label by appointment by the Recording Academy.   In the last decade, Alex has focused his direction more so on digital marketing and the cannabis industry.   Over that span to date, he has been appointed key roles in MegaUpload, in relation to leveraging consumer and media data of a user base of 50M unique IP's daily and public relations, Otherside Farms, an Education and Cultivation co-op in Southern California, Northsight Capital in Arizona and mCig Group, headquartered in Florida. He attended the University of Souther California, UC Riverside and Mt. San Antonio College specializing in Mechanical Engineering, with emphasizes in Hydraulics and Fluid Power Technologies.

31.   Given the multiple public companies they mention as indicia of their expertise (including several microcap companies) Defendants Rosenberg and Hawkins each knew that in order to sustain a trading range for mCig's stock price, in order to maintain the appearance of value in their shares, they needed to control the supply of free-trading market shares by limiting (at any cost it seems) the supply of said shares and precluding same from *hitting the market* to be proffered for sale.

32.   But, given the dearth of cash on hand at mCig, the only commodity they had to attract employees and talent to their modest workforce, is the very stock they needed to control.

33.   In fact, at or about the time they hired Plaintiff Sassano, their SEC

Filing(s) report an accumulated **_deficit_** of $2,951,972.

34.    Moreover, consistently, then and now, mCig's filings include the following mandatory "Going Concern"[4] admonishment:

> The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate continuation of the Company as a going concern. However, the Company has recurring losses from operations of $1,056,825 and an accumulated deficit at July 31, 2014 of $1,438,478 and needs additional cash to maintain its operations.

> These factors raise doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. The Company's continued existence is dependent upon management's ability to develop profitable operations, continued contributions from the Company's executive officers to finance its operations and the ability to obtain additional funding sources to explore potential strategic relationships and to provide capital and other resources for the further development and marketing of the Company's products and business.

35.    Thus, when they offered Plaintiff Sassano a job, Defendants Rosenberg and Hawkins knew that (1) they had only mCig Stock to proffer as remuneration; and (2) despite their issuance of any stock to Plaintiff as the bulk of his wages for the work he was expected to perform, they would have to restrain Plaintiff's future efforts to liquidate said shares.

36.    Regrettably, it appears they were especially committed to the latter

---

[4] ASU 2014-15 (the "going-concern standard," codified in ASC 205-40) provides guidance on how to determine when and how to disclose going-concern uncertainties in the financial statements. The going concern standard requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date the financial statements are issued (or within one year after the date that the financial statements are available to be issued when applicable). Under the standard, an entity must provide certain disclosures if conditions or events "raise substantial doubt about the entity's ability to continue as a "going concern."

objective and it seems, by any means necessary (hook or crook).

37.   To the extent any bargain they might strike with plaintiff in order to secure his employ would yield Plaintiff a significant number of shares, they knew any eventual attrempt by Plaintiff to sell those shares, once eligible, would adversely affect the market for mCig shares and the likely collapse of the stock price, they had tried to protect for so long.

38.   Of course, neither Rosenberg nor Hawkins  disclosed to Plaintiff these tandem predicaments and of primary import, they certainly never disclosed their plans to contain, restrain, prevent preclude any selling efforts Plaintiff might pursue.   Instead, they allowed Plaintiff to believe liquidation or sale of any sharres he might receive as cokpensation would be a simple affair, limited only by the operative securities rules and regulations.

39.   Plaintiff, given his inexperience in microcap companies, made for the sort of unsuspecting subject ideally suited for the ruse Defendants had in mind at the outset of their offer to Plaintiff.

C.     **The Consulting Agreement**

40.   In and about the weeks prior to February 18, 2015, mCig, and each of the individual Defendants, engaged Plaintiff in discussions, first contemplating, and then ultimately proposing, the engagement of Mr. Sassano and his services or employ in furtherance of facilitating mCig's operational activities as proffering Plaintiff the formal title of "Vice-president of Engineering.

41.   For Sassano, this was no small undertaking.  He lived (and still lives) in Florida with his wife and children; and the prospect of accepting mCig's offer came with  a significant measure of stress and considerable burden and inconvenience, including the arduous, coast-to-coast flights, and the hassle of arranging for additional living accommodations in Las Vegas, and the weeks,

sometimes months, he and his family would endure resulting from his absence from home away from his wife and kids.

42.   Nonetheless, subsequent to discussions and dialogue, between these litigants, mCig, through Hawkins and Rosenberg, entered into a formal written agreement with Sassano who accepted the offer, identifying February 18 , 2015 as the Agreement's "Effective Date" and the beginning of Sassano's tenure with this new enterprise.

43.   The Agreement called for a term of three (3) years, from February 2015 through February 2018 (the "Term") and included provisions for automatic renewal, allowing for additional, consecutive one (1) year terms, on substantially the same terms and conditions as the initial three-year term, absent mCig's written notice of its intent to terminate the Agreement and 30-days' notice as to said termination.

44.   The Agreement itemizes the nature of those duties imposed upon Sassano in conjunction with his engagement or employ, specifying said duties as follows:

(a)   Facility Engineering and Sourcing: Mechanical Engineering & Sub-Contractor Selection;

(b)   Preparation of Operating Plans for Licensing: Preparation and Coordination of Full Signed & Sealed Architectural & Mechanical Engineer Plans;

(c)   Cultivating Facility Design and Build Blueprints: Overseeing Facility Design/Blue Prints, Value Engineering, General Guidance and Consulting of Plans for Cost Measures;

(d)   Selection of Necessary Equipment;

(e)   Procurement of Building Permit:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(f)   "Planing & Zoning Acceptance"

(g)   "Building Permit";

45.   Notably, the Agreement, in describing Sassano's prospective duties, effectively precludes him from engaging in any activities, work or services,  the nature of which might invoke the licensure  mandates imposed by  the State of Nevada and its statutes, rules and regulations germane to  *general contractors* and their activities.  Specifically and explicitly, the Agreement incorporates the following language: "[T]his Agreeement does NOT include any construction or construction management duties."

46.   As for remuneration, the Agreement describes Sassano's payment or consideration for his day-to-day work or employ with mCig thusly:

(a)   The Company shall pay Consultant **Fifteen Thousand US Dollars ($15,000) per month, paid in newly issued shares of mCig, Inc. (the "Monthly Payment"),**[5] based on the average closing price of the stock during the final ten trading days of each month. Such payments to be made within five (5) business days following the end of each month.

(b)   Issuance of each monthly payment shall constitute an acceptance by the Company of the duties performed by the Consultant.

(c)   All Travel Expense to be paid by the company including; Airfare, Hotel, Auto Rental, and a Daily Meals allowance.

(d)   The Company shall pay Consultant a fee by wire transfer or certified check of Ten Percent (10%) of net revenue derived from sales and distribution deals the Consultant brings to the Company.

(e)   The fees may be amended from time to time by the Board or the Executive Officers in their sole and absolute discretion.

(f)   The Consultant agrees that the Consultant, directly or indirectly through affiliates, will be limited to selling no more than five percent (5%) of the total number of shares owned, each trading day.

47.   Article "4" of the Consulting Agreement addressed certain issues related

---

[5] Emphasis added.

to the termination of the Agreement.  Specifically, Article "4" of the Agreement states: "[A]t any time, either party may terminate, without liability, the Consulting Term for any reason. The Consultant shall provide the Company with 30 days prior written notice of such Consultant's intent to terminate this Agreement."

48.   Of further note, Article "6" of the Agreement, entitled "Independent Contractor Relationship" reads in its entirety, as follows:

> The Consultant is an independent contractor of Company and, except to the extent specified in this Agreement, Company may not control or direct the details and means by which Consultant performs its duties under this Agreement. This Agreement shall not create the relationship of employer and employee, a partnership or a joint venture. Neither the Consultant nor Company shall be deemed an agent of the other on account of this Agreement or the performance of any of their obligations hereunder. The Consultant does not have any authority to bind Company to any agreement or contract.

49.   At no point in time was Sassano an officer, director, or control person of MCIG.

50.   MCIG drafted, or caused to be drafted, the Consulting Agreement and explicitly admit as much at Article "6" of the Agreement.

51.   The Consulting Agreement was executed by MCIG and/or Scalable, by and through, Defendant Rosenberg as President, CEO, director of MCIG.

52.   In accordance with the terms of the Consulting Agreement, Defendant(s) issued Plaintiff(s), MCIG shares as follows:

| | |
|---|---|
| 3/31/16 | 375,000 shares of Common Stock |
| 4/30/16 | 403,226 shares of Common Stock |
| 5/31/16 | 441,176 shares of Common Stock |
| 6/30/16 | 365,854 shares of Common Stock |
| 7/31/16 | 416,667 shares of Common Stock |
| 8/31/16 | 517,241 shares of Common Stock |

53.   After moving to Las Vegas and commencing work with MCIG Plaintiff and Defendants Rosenberg and Hawkins  formed a new subsdiary, Scalable Solutions  (in and about March of 2016).   At inception MCIG, received 40 membership units and Sassano, (through Zoha) received 20 units. ZOHA also received a ten-year option to purchase additional units to expire on March 6, 2026.

54.   The Board Resolution authorizing said option reads in part as follows:

> Pursuant to Nevada corporation and limited liabilities company law, and the Membership Agreement of Scalable Solutions L.L.C., (the "Company") the undersigned being all of the members of the Company hereby waive notice, adopt the following resolution which was unanimously adopted and hereby consent to the taking of the actions therein set forth:

> WHEREAS, the Company recognizes the time, effort, skills, marketing, and other services provided by Ronald Sassano, by and through ZOHA Development, LLC in the development of the Scalable Solutions business strategy, business model, and corporate identity; and,

> WHEREAS, Ronald Sassano and ZOHA Development, LLC will continue to provide services on behalf of the Company as may be mutually agreed upon from time to time; and,

> WHEREAS, the Corporation desires to appoint Ronald Sassano as the Chief Executive Officer of the Company; and,

> WHEREAS, the Corporation desires to ensure Ronald Sassano and ZOHA Development LLC is properly incentivized to grow the business of Scalable Solutions through his contacts and expertise with a vested interest; and,

> WHEREAS, the Corporation desires to provide ZOHA Development LLC with a ten (10) year option to acquire 50 membership units of Scalable Solutions, Inc., for the price of $50.00 raising the consolidated amount owned by Ronald Sassano and ZOHA Development LLC to 60 units of 100 authorized units [*sic*?].

55.   In March of 2016, MCIG, Sassano and Zoha agreed to pursue "the construction division" of MCIG in support of the cannabis and CBD industry in the State of Nevada.

56.     On or about October 25, 2016, one or more of the Defendants caused to be published and disseminated an MCIG press release purporting to quote Paul Rosenberg. Said release appears on the internet on several websites, including, for example, https://www.smallcapexclusive.com/mCig-inc-otcmktsmCig-shares-30-gain-just-tip-iceberg/ and https://investorshub.advfn.com/mCig-Inc-MCIG-25691/

57.     The release describes MCIG thusly:

> mCig, Inc. [a] diversified company servicing the legal cannabis, hemp and CBD markets via its lifestyle brands. mCig has transitioned from a vaporizer manufacturer to industry leading large scale, full service cannabis cultivation construction company with its Scalable Solutions division currently operating in the rapidly expanding Nevada market.[6]

58.     Sassano provided Defendants with certain professional consulting services relating to construction site administration and scheduling and mCig started operations for a number of MCIG's marijuana and CBD related client projects.

59.     MCIG intended to operate Scalable as a subsidiary with Sassano managing its construction projects.

60.     The term of the Consulting Agreement as bargained for by the parties was to commence on March 1, 2016 and was to continue for six months and thereafter, on a month to month basis.

61.     Ultimately, MCIG replaced Scalable as its construction subsidiary with a newly formed entity namely, GCI.[7]

62.     Plaintiff dutifully cooperated in transferring to GCI (from Scalable) any

---

[6]     https://www.smallcapexclusive.com/mCig-inc-otcmktsmCig-shares-30-gain-just-tip-iceberg/ and https://investorshub.advfn.com/mCig-Inc-MCIG-25691/

[7] Upon information and belief, some time in December 2016 - January 2017, Defendants began operating the "construction division" of MCIG under the corporate moniker of "Grow Contractors, Inc." which succeeded Scalable Solutions, LLC as an operating entity. Scalable appears to continue to exist as a business entity as of this writing, but it is in *default* status with the NVSOS.

and all pending or prospective customers or clients.  Moreover, Plaintiff Sassano agreed to stay on with MCIG to shepherd the transition and serve said customers for the benefit Scalable and the other Defendants.

63.     Subsequently, Sassano continued to work for MCIG as an independent contractor and consultant for GCI in the very same capacity and was to receive shares of MCIG on the same terms as specified in the Consulting Agreement.

**D.     The MCIG Stock Option(s)**

64.     On or about October 1, 2016 instead of paying Plaintiff by directly issuing him shares in an amount equivalent to the sum of $15,000 for said month, Defendant(s) presented Plaintiff(s) Sassano and Zoha with a stock option.

65.     Nothing had changed.

66.     The stock still formed the bulk of his remuneration and wages.

67.     On or about April 11, 2017, Defendant M. Hawkins followed up by sending (via email) Plaintiff(s) a copy of the Notice of Grant of Stock Option evidencing this. The so-called option afforded Plaintiff(s) the apparent "right" to purchase up to 500,000 shares of Common Stock of MCIG (identified as Grant #20170002a).

68.     But this was inconsient with prior stock issuances as agreement upon by the parties.

69.     By April 11, 2017 the option had fully vested in favor of Plaintiff(s).

70.     The Grant of Option afforded Plaintiff(s) the right to a cashless exercise such that the total number of shares ultimately issuable to Plaintiff(s) under the Option would be reduced by the market value of those shares necessary to pay for exercise and Plaintiff(s) would receive the difference.

71.     On April 11, 2017, MCIG (through Defendant M. Hawkins sent to

Plaintiff(s) via email (the "April Email") a fully executed Stock Purchase Notice of Exercise pre-addressed back to MCIG electing (irrevocably) to purchase 123,170 shares of the Common Stock of MCIG in a cashless exercise pursuant to the Notice of Grant (hereinafter referred to as "Stock Exercise #1").

72.     *Inexplicably*, MCIG had *back-dated* this Notice of Exercise as though it had been executed on November 11, 2016.

73.     Also on April 11, 2017, in the same email, MCIG sent Plaintiff(s) a second Stock Purchase Notice of Exercise pre-addressed back to MCIG electing (irrevocably) to purchase 376,830 shares of the Common Stock of MCIG in a cashless exercise pursuant to the Notice of Grant (hereinafter referred to as "Stock Exercise #2").

74.     MCIG also back-dated this second notice, this time using the date of April 10, 2017.

75.     As the manager of Zoha, Mr. Sassano duly executed the Notice of Grant as called for, as well as Stock Purchase Exercise #1 and the Stock Purchase Exercise #2, no quite understanding the rationale for the apparent departure from the terms of his Agreement with mCig.

76.     But he dutifully remitted same to MCIG on that April 11, 2017.

77.     Yet, Defendants never honored the exercise and never issued him the shares he was supposed to receive for the last two month of his employ with mCig.

78.     Instead, Defendants unceremoniously terminated Plaintiff and his tenure as consultant.

79.     Since returning the executed documents described above, Plaintiff(s) have made *several* attempts, to ascertain the status of these shares and any stock certificates (totaling 500,000 shares of Common Stock of MCIG).

80.     As of the date of this filing, Plaintiffs have yet to receive any adequate

response or explanation as to the departure form the terms of the Agreement or the delay and then refusal to issue the remaining shares due to Plaintiff.

81.    In the April Email previously referenced, M. Hawkins instructed Sassano to *sign the attached documents and return to me*.

82.    Mr. Sassano complied with this request even though the documents appeared then (and now) to have been backdated, bearing dates well before the date of the receipt of the April Email.

83.    It is likewise *peculiar* that the dates on the Notice of Grant, Stock Exercise #1 and Stock Purchase Exercise #2, as well as the date the documents were *actually* signed by Mr. Sassano and returned to MCIG, *precede* the end of MCIG's fiscal year of April 30, 2017.

84.    Notwithstanding, MCIG's Form 10-K Annual Statement for fiscal year ended April 30, 2017, failed to disclose any of this information and the underlying transactions giving rise to these agreement(s) and instruments.

85.    The Notice of Grant and the subsequent election(s) to conduct a cashless purchase of the 500,000 shares of MCIG go unmentioned in said filings before the Commission.

86.    Even if the physical certificates evidencing the securities were not then issued (before the end of the fiscal year-end) these material transaction(s) should have been disclosed (at the very least as a subscription receivable) on MCIG's balance sheet, as well as in a note (or notes) to the financial statements.

87.    Setting aside the dates *artificially* crafted or concocted by MCIG in the above referenced documents, for purposes of Rule 144's[8] tacking rules giving rise to a safe harbor, as of October 11, 2017, the common stock underlying the execution of the option(s), by Mr. Sassano (on April 11, 2017) are now eligible to

---

[8] 17 C.F.R. § 230.144

be issued without restrictive legend.

88.     MCIG still owes Plaintiff(s) a total of 500,000 shares of common stock which Defendants refuse to issue.

89.     These shares when issued, are immediately eligible for resale without restriction.

**E.      Defendants Impede Plaintiff(s) Efforts to sell MCIG Stock**

90.     Although Defendant(s) did in fact issue to Plaintiff(s) *some* of the stock they were obliged to, they have since engaged in a systematic effort to thwart any effort by Plaintiff(s) to sell these shares over the market or otherwise.

91.     To that end, Defendant(s) concocted a series of ruses or artifice(s) calculated or devised to protect and manipulate the market for MCIG's common stock to the direct detriment of Plaintiff(s).

92.     For example, on or about June 6, 2017 via email, MCIG, through Rosenberg and R. R.  Hawkins, told Plaintiff Sassano (and several MCIG employees with MCIG shares) that MCIG management was *trying to push the company to new levels* and further, attempted to dissuade Plaintiff Sassano and MCIG employees with MCIG shares, from selling over the market so as to facilitate reach these *new levels*.

93.     These statements were a ruse intended to camouflage the true intent as previously described.

94.     In at least one email, MCIG, through Rosenberg and M. Hawkins wrote Plaintiff Sassano the following: *You know how important the share price for [the] financial health of the Company is"* ….thus suggesting that any sales over the market might adversely affect the very *financial health* of MCIG.

95.     In yet another iteration of this scheme designed to prevent or preclude Plaintiff(s) from selling their shares, MCIG, through emails from Rosenberg and

M. Hawkins, notified Plaintiff Sassano of a newly adopted "policy" mandating that each employee or shareholder provide monthly account statements to management for any securities account holding MCIG shares and further, mandating that said individuals sign leak-out agreements.

96.     This transparent effort to monitor any sales by offending employees who might audaciously presume they could actually sell any of their shares formed yet another tactic serving Defendants ruse.

97.     The true objective of said *ad hoc* policy, was to impede, prevent, or limit sales (and thus the supply) of the stock on the market so as to maintain Defendants' efforts to manipulate the price of mCig stock on the market.

98.     But said conduct was no more than a thinly veiled ruse and an attempt to interfere with the free and fair operation of the market for these securities and appears precipitously close to bordering on market manipulation by a public company officer.

99.     In and about  June of 2017, Rosenberg attempted to cajole Plaintiffs into signing a sign a leak-out agreement and recruited others (intermediaries)  to reach out to Plaintiff Sassano and persuade him accordingly.

100.    This was a blatant effort to limit sales of any MCIG stock and control or manipulate the market for same.

101.    Moreover, Defendant Rosenberg asked that Plaintiffs not sell any stock into the market "right now" as MCIG was working with an *investment banker* referred to by Defendant(s) as "Michel".

102.    Defendant(s) claimed that "Michel" was *sitting on the bid price,* through his *family office* to *help support the stock price.*

103.    Plaintiff has since learned from others working with Defendant Rosenberg that he expressed to several others, considerable consternation and

concern as to Plaintiffs' prospective sales of MCIG stock over the market.

104.    Mr. Rosenberg further elaborated, admonishing Mr. Sassano (and his brother) that: *any selling would damage the Company's stock, and the Company would lose [the stock promoter] and the benefit of his efforts to support the bid.*

105.    The truth was that the apparent stock promoter, "Michel" was hired to assist Rosenberg and Hawkins in their efforts to manipulate the stock price for mCig shares, thus lulling Plaintiff Sassano into a false sense of security, that the value of his shares remained.

106.    Notwithstanding, Plaintiffs refused to sign the leak out agreement as Sassano began to suspect foul play.

107.    Defendants statements, when viewed through the lens of the June 6 email, suggest conduct on the part of MCIG management likely to run afoul of state and federal securities laws and the rules and regulations as promulgated thereunder perhaps akin to market manipulation.

108.    When these efforts failed to dissuade Plaintiff(s) from endeavoring to exercise their basic right to sell the subject securities; when Defendants could not persuade or cajole Plaintiffs to hold off on selling stock, MCIG, Rosenberg, and M. Hawkins employed yet another scheme or artifice, concocting yet another pretext.

109.    This time, on June 19, 2017, Rosenberg notified Plaintiff(s) by way of email, that MCIG's legal counsel had *revisited* the company's filings as an issuer reporting with the Securities and Exchange Commission, in tandem with the MCIG's disclosure policies and protocols for identifying so-called *issuer affiliates* or control person(s).

110.    Rosenberg claimed that MCIG legal counsel had *suggested* that *all key personnel* of GCI should henceforth be listed as affiliates of MCIG.

111.    Of course, by doing so, MCIG, M. Hawkins and Rosenberg could secure

the objective they intended from the outset.  Namely, they could thwart or limit Plaintiffs from rightfully selling their MCIG shares by forcing upon Sassano *additional restraints, impeding his right to liquidate.*

112.   But Defendants Rosenberg and Hawkins never disclosed to Sassano, that such a development was even conceivable.

113.   They each knew that Plaintiff Sassano desperately relied on the expected sales proceeds he was assured by Defendants he would yield in short order,  after the standard holding period.

114.   Sassano had no other income or source of recurring cashflow except for ewhat he thougt he might realize from selling mCig stock.  (What's more, whatever savings he might have had before moving to Las Vegas, were fast depleting. )

115.   And back in Florida, Sassano had a family to support; and these Defendants knew this.

116.   None of these personal details dissuaded Defendants from persisting in their scheme.  On July 21, 2017, MCIG, through Rosenberg, emailed Plaintiffs (Sassano and Zoha) *cc'ing* multiple third-parties, including securities intermediaries (Plaintiffs' securities broker and brokerage firms and MCIG's transfer agent) in a blatant effort stop or certainly hinder or delay Plaintiff(s) efforts to sell any MCIG shares over the market.

117.   They knew that by tainting the propriety of any attempted sale by Sassano of the subject shares, these securities intermediaries would act immediately freeze and such transactions in Sassano's account.

118.   But their claims were merely a ruse.  Well before this timeframe Sassano had lost even the remotest nexus to the details of the business and thus could not have benefitted from any so-called inside information.

119.   The email they sent to securities intermediaries reads in part as follows:

Please be advised that it is the Company's intention to list Ronald Sassano as a company [MCIG] insider in its upcoming Annual Report Form 10-K filing. While Mr. Sassano does not qualify as an "Affiliate" insider pursuant to Rule 144 of the Securities Act of 1933, we have concluded that Mr. Sassano may be aware of material non-public information (and, as such, any trades made would be subject to the limitations of insider trading federal limitations). We recently learned that Ronald Sassano was the managing director of MacMas Real Estate and Agriculture Private Equity Opportunity 2 Fund, LLC, which the Company contracted to manage its subsidiary, Grow Contractor's Inc., which represented approximately 33% of the Company's total income for FY 2017. As such, the subsidiary and its management would have ongoing access to material non-public information. I believe Mr. Sassano may have failed to disclose that he was the managing director and a beneficiary of MACMAS when providing information to obtain releases of his stock under Rule 144. We rescind all documents signed by the Company authorizing the prospective sale of any stock under Rule 144 that does not list him as possessing material non-public information.

120.    But these claims were false and certainly misleading.

121.    By mischaracterizing Plaintiff as a Schedule 16 insider or affiliate, Defendants harmed Plaintiffs without justification or cause.

122.    In the Form 10-K Annual Report for the fiscal year ended April 30, 2017, Defendants blatantly misrepresent Plaintiff Sassano's status as a shareholder.

123.    Defendants have willfully abused and contorted Section 16 (15 USCS §78p) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

124.    They have done the same with respect to Title 17, Chapter II, Part 240 (§240.10b5-l) and those provisions addressing the concept of *Non- Statutory Insider(s)*.

125.    Defendants' conduct has resulted in *significant harm* to Plaintiffs and Defendants' abject refusal to mitigate said harm, has compounded matters.

126.    Indeed, from the outset, Defendants MCIG, M. Hawkins and Rosenberg

conspired to cajole and induce Plaintiff Sassano into accepting the securities at issue as consideration for the bargain (as his sole compensation and living wage) lulling him into believing that they might be able to sell said securities without impedance, save for those rules and regulations germane to the resale of restricted securities.

127.   Plaintiffs relied on Defendants' representations, unaware of intentionally surreptitious omissions, namely, that Defendants would never allow Plaintiffs to sell said securities except at the whim and pleasure of M. Hawkins and Rosenberg.

128.   Meanwhile, upon information and belief, M. Hawkins and Rosenberg have each enjoyed a personal pecuniary benefit from their own MCIG stock holdings whilst impeding any sales by employees and other shareholders, including Plaintiffs, thus engaging in brazen self-dealing to the detriment of Plaintiffs.

F.   **The Fiduciary Duties of M. Hawkins and Rosenberg as Directors and/or Officers.**

129.   As directors and officers of MCIG, these defendants owed fiduciary duties of candor, good faith and loyalty to Plaintiffs as shareholders. They are prohibited from engaging in self-dealing as well as any other unlawful, corporate conduct, including but not limited to violations of the laws, rules and regulations applicable to MCIG and its corporate governance protocols as dictated by Chapter 78 of the Nevada Revised Statutes[9] and its articles and bylaws. Likewise, they are charged with dutifully obliging federal law and the rules and regulations as promulgated by the Securities and Exchange Commission with respect to publicly traded or listed issuers reporting with the Commission.  Most

---

[9] NRS Chapter 78 - Private Corporations.

certainly, willful intentional misconduct (false filings) constituting fraud and other malfeasance evidences an express abdication of these fiduciary duties.

130.   Because of their positions of control and authority as directors and/or officers of MCIG, The Director-Defendants named herein exercised and continue to exercise control over the wrongful acts complained of herein and continue to harm these Defendants particularly.

131.   Subsequent to multiple attempts to reach out to these Defendants in order to resolve this matter, (which efforts repeatedly failed given Defendants intractable position and abject refusal to comply with the Agreement(s) and the rules and regulations germane to these matters) Plaintiffs were forced to retain legal counsel.

132.   Legal counsel for Plaintiff sent MCIG a letter detailing their assessment of the issues germane to this dispute and Plaintiff's position.

133.   Notwithstanding, counsel for Plaintiffs suggested the parties meet (together with respective counsel to discuss these matters and, to the extent that Plaintiff might have misunderstood or miscommunicated, the relevant facts and circumstance to counsel, the lettered proffered MCIG and its officers, the opportunity to discuss and clarify same in an open and cordial, face-to-face, dialogue.

134.   Plaintiffs' counsel's suggestion was summarily rejected.

135.   In sum, Defendants' conduct (each and collectively) is simply unconscionable.

136.   As a result of the actions and conduct of these Defendants, and the considerable harm they have visited upon Sassano and Zoha, Plaintiffs seek any

and all remedies available to it resulting from the malicious and fraudulent unlawful and tortious conduct of these individual defendants in their individual capacities.

137.     Furthermore, Plaintiffs seek to recover the costs of suit, attorneys' fees and other incidental relief in connection with the following claims.

//

//

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Breach of Contract**

*(As to Defendants MCIG, Scalable, and GCI)*

1.     Plaintiffs repeat and incorporate all preceding allegations.

2.     Defendants MCIG, Scalable/GCI have willfully failed to abide by the explicit and implicit terms of the Agreements with Sassano and then  Zoha.

3.     These Defendants failed perform their respective duties under these terms including but not limited failing to deliver, in a timely fashion, the securities at issue.

4.     They failed to abide by the warranties and covenants and otherwise knowingly proffered covenants, warranties and representations they knew to be false and upon which Plaintiffs relied as a condition to entering into the Agreement(s).

5.     Defendant(s) entered into binding agreement(s) Plaintiffs.

6.     Plaintiffs performed all the obligations required of them relative to the Agreement.

7.      Defendant(s) and/or their agents breached their duties and obligations owing to Plaintiffs under the Agreements by, among other things, failing to perform and by making warranties, covenants and representation(s) they knew to be false and by taking action to rob from Plaintiffs the whole bundle of rights and benefits as represented by the subject securities, namely, the right or opportunity to sell same when eligible.

8.      These actions were in direct violation of the explicit and implicit terms of the Agreement(s) and constitute a material breach of same.

9.      Plaintiffs have been damaged by Defendant(s) breaches in an amount in excess of $75,000.

10.      Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorney's fees incurred herewith.

## SECOND CLAIM FOR RELIEF
## Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing

*(As to Defendants MCIG, Scalable)*

11.      Plaintiffs repeat and incorporate all preceding allegations.

12.      Defendant(s) failed to abide by the warranties and covenants they made in said Agreement(s) and otherwise knowingly proffered covenants, warranties and representations they knew to be false and upon which Plaintiffs relied as a condition to entering into the Agreement.

13.      Such tactics are not consistent with the contractual covenant of good faith and fair dealing.

14.      The implied covenant of good faith and fair dealing is required in every contract under Nevada Law.

15.      Defendant(s) and their agent(s) owed a duty of good faith to the

Plaintiffs

16.     Defendant(s) and their agent(s) breached that duty by failing to perform in a manner that was faithful to the purpose of the Agreements by failing to comply with the terms of the Agreement, by knowingly making covenants, warranties and representations they knew to be false, and by failing to exercise diligent and good faith efforts on the Plaintiffs' behalf with respect to fulfilling their obligations under Agreement.

17.     The Plaintiffs' justified expectations were thus denied.

18.     The Plaintiffs have been damaged by Defendant(s)'s breaches of the implied covenant of good faith and fair dealing in an amount in excess of $75,000.

19.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorney's fees incurred herewith.

### THIRD CLAIM FOR RELIEF
### Securities Fraud 10(b); 10(b)-5
### Misrepresentation/Concealment

*(As to Defendants M. Hawkins, Rosenberg and MCIG)*

20.     Plaintiffs repeat and incorporate all preceding allegations.

21.     Defendants M. Hawkins, Rosenberg and MCIG perpetrated a scheme and artifice to misrepresent the nature of their dealings and transactions, all with the purpose of inducing Sassano and Zoha into entering into the Agreements and usurping unfettered control Scalable and its business and clients.

22.     M. Hawkins, Rosenberg and MCIG lulled Plaintiffs into accepting warrants, options or shares (securities) as payment, which securities Defendants led Plaintiff to believe could be sold over the market, subject only to the customary holding period.

23.    From the outset, they never intended to allow, Plaintiffs to sell the shares as expected and never intended to honor the options or warrants.

24.    Defendants M. Hawkins, Rosenberg and MCIG  willfully filed one or more periodic filings (Form 10-K) and other SEC filings (intermittent or current) which they knew to be false, misrepresenting or mischaracterizing Plaintiffs and their respective status in a concerted effort to prevent, preclude or restrict their ability to sell their shares and taint any selling efforts in the eyes of securities intermediaries and regulators.

25.    In willful and blatant disregard of corporate governance protocols and in blatant disregard for the truth, these Defendants falsely claimed Ron Sassano was a non-affiliate, or statutory insider, and filed false and misleading statements specifically to prevent Plaintiffs from selling so as to manipulate, protect or maintain the market for MCIG's common stock.

26.    M. Hawkins, Rosenberg and MCIG made or authorized these SEC filings and/or certified their accuracy notwithstanding their knowledge to the contrary.

27.    They had, as their ulterior purpose, to use their dominance and control over MCIG and its market for shares for their own ends and at the expense of Plaintiffs' interests.

28.    Defendants M. Hawkins, Rosenberg and MCIG, acting in their individual capacities and as agents of each other made false and misleading representations to Plaintiffs as detailed in the general allegations.

29.    Defendants M. Hawkins, Rosenberg and MCIG in willfully filing or causing to be filed, false periodic and intermittent reports with the Securities and Exchange Commission ("SEC") and thereafter, holding out said filings as true and materially accurate.  In so doing, these Defendants breached their fiduciary duties to Plaintiffs and did so purposefully and specifically to so as to harm these

1    Plaintiffs.

2    30.    Moreover, said Defendants directly engaged in (and/or aided and
3    abetted each other, in conduct resulting in) violations of Section 10(b) of the
4    Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5(b) thereunder.

5    31.    They did so willfully, intentionally, and maliciously so as to harm these
6    Plaintiffs.
7
8    32.    Plaintiffs relied on Defendants' representations (unaware of their falsity
9    and surreptitious material omissions) by entering into the Agreement(s) and
10   performing the work as called for, as described in the preceding allegations.

11   33.    Plaintiffs'    continued    reliance    on    Defendants'    material
12   misrepresentations and omissions throughout, lulled them into a false sense of
13   assurance.

14   34.    Said reliance was justified because Plaintiffs had no knowledge at the
15   time that the representations were false, grossly misleading, or that material
16   information had been concealed or mischaracterized or that Defendants had no
17   intention to allow Plaintiffs to sell all of the shares over the market.
18
19   35.    Plaintiffs have been damaged by Defendants' fraud, misrepresentation
20   and concealment in an amount exceeding $75,000.

21   36.    Defendants' *continued* fraud, misrepresentation and concealment is
22   oppressive and/or malicious, willful and wanton and was motivated, in part, by
23   Defendants' decision to further their own interests, which interests were in
24   conflict with the Plaintiffs' interest. As such, Plaintiffs are entitled to an award of
25   punitive damages.

26   37.    Plaintiffs have been required to retain the services of counsel to
27   prosecute this matter and, as such, are entitled to an award of their costs and
28   reasonable attorneys' fees.

38.     Defendants made an untrue statements of a material facts and omitted material facts necessary under the circumstances to keep the statements that were made from being misleading in connection with their sale of securities to Plaintiffs.

39.     Defendants acted knowingly.

40.     The defendant used, or caused the use of an instrumentality of interstate commerce, (through emails and telephone) in connection with the sale of securities and made untrue statements and material omissions.

41.     The plaintiff justifiably relied on Defendants' untrue statement of a material fact unaware of omissions necessary to state a material fact in proffering consideration or buying said securities; and

42.     The Defendants' misrepresentations and omissions caused Plaintiffs to suffer damages.

## FOURTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
*(M. Hawkins and Rosenberg)*

43.     Plaintiffs repeat and incorporate all preceding allegations.

44.     Defendants M. Hawkins and Rosenberg, as officers and directors of MCIG owe Plaintiffs a fiduciary duty.

45.     Defendants breached their fiduciary duties by, among other things, failing to oblige their duties of care and loyalty to Plaintiffs as fiduciaries and making numerous untrue or misleading statements of material fact and omitting material facts in connection with SEC filings and the initial Agreements both before and after its execution.

46.     Moreover, Defendants M. Hawkins and Rosenberg failed to exercise diligent and good faith efforts on behalf of CTI shareholders.

47.     Plaintiffs seek recompense in excess of $75,000 and other equitable relief as a result of Defendants' breach.

## FIFTH CLAIM FOR RELIEF
## Breach of Duty of Care
### *(M. Hawkins and Rosenberg)*

48.     Plaintiffs repeat and incorporate all preceding allegations.

49.     Defendants Hawkins and Rosenberg have a fiduciary relationship with Plaintiffs as officers and directors, and shareholders, of MCIG, respectively.

50.     Defendants M. Hawkins and Rosenberg had a duty of care with respect to their management of MCIG.

51.     These Defendants breached their duties to Plaintiffs by failing to exercise reasonable care with respect to said duties and refusing to honor or cooperate with presentment of the subject securities by Plaintiffs.

52.     Due to their actions, Plaintiffs have been damaged in an amount in excess of $75,000.

53.     Defendants Hawkins and Rosenberg respective breaches of this duty of loyalty were oppressive, fraudulent, and/or malicious.

54.     Plaintiffs are therefore entitled to punitive or exemplary damages.

55.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and attorney's fees incurred herein

## SIXTH CLAIM FOR RELIEF
## Breach of Duty of Loyalty
### *(M. Hawkins and Rosenberg)*

56.     Plaintiffs repeat and incorporate all preceding allegations.

57.     Plaintiffs and Defendants M. Hawkins and Rosenberg have a fiduciary

relationship with Plaintiffs as officers and directors and shareholders of MCIG, respectively.

58.     Defendants M. Hawkins and Rosenberg had a duty of loyalty with respect to their management of MCIG.

59.     Defendants breached their duties of loyalty to Plaintiffs by failing to exercise reasonable care and refusing to honor, or cooperate with presentment, of the subject securities by Plaintiffs.

60.     Defendants breached their duties to Plaintiffs by failing to exercise a reasonable degree of loyalty with respect to said duties.

61.     As a result of Defendants' actions, Plaintiffs have been damaged in an amount in excess of $75,000.

62.     As a result of Defendants' conduct, Plaintiffs were not able sell all of the stock their bargain with Defendants entitled them to sell, given that Defendants have refused to deliver all of the shares.  And as for those sales Plaintiffs were finally able to make, as a direct and intended result of these Defendants, Plaintiffs were forced to liquidate at much lower prices than were prevailing when they should have been eligible to sell.

63.     Defendants' breach of their respective duties of loyalty was oppressive, fraudulent, and/or malicious.

64.     Plaintiffs are therefore entitled to punitive or exemplary damages.

65.     Plaintiffs have been required to retain the services of counsel to prosecute this matter and, as such, are entitled to an award of their costs and attorney's fees incurred herein.

## SEVENTH CLAIM FOR RELIEF
### Declaratory Relief
*(All Defendants)*

66.     Plaintiffs repeat and incorporate all preceding allegations.

67.     Under N.R.S. §30.010 et seq., the Uniform Declaratory Judgment Act, any person interested under a written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a contract, may have determined any question of construction or validity arising under the contract and obtain a declaration of rights, status or other legal relations thereunder.

68.     A justiciable controversy exists as Plaintiffs have asserted a claim of right to the shares as bargained for.

69.     Moreover, Plaintiffs assert they are not affiliates or statutory insiders.

70.     Defendants have thus far failed to concur.

71.     Accordingly, the controversy is between persons whose interests are adverse.

72.     Plaintiffs have legally protectable interests in the controversy, i.e., their equity ownership of their respective shares of MCIG and their right to more shares or securities and Plaintiffs' rights to sell said securities over the market.

73.     Defendants have conducted themselves as rogue officers and directors in contravention of their duties under Nevada Law.

74.     The issues involved in the controversy are ripe for judicial determination because there is a substantial controversy, among parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

75.     Plaintiffs therefore seek declaration(s) from this Court in favor of Plaintiffs as to these matters.

76.     Plaintiffs have been required to retain the services of counsel to

prosecute this matter and, as such, are entitled to an award of their costs and reasonable attorneys' fees incurred herein.

## EIGHTH CLAIM FOR RELIEF
## <u>Unjust Enrichment</u>
### *(All Defendants)*

77.     Plaintiffs repeat and incorporate all preceding allegations.

78.     In the alternative, or to the extent this Court finds an absence of contract, Plaintiffs request equitable relief.

79.     The fruit of Defendants' fraudulent acts of misrepresentation, omission and inducement constitute permanent and valuable benefits conferred upon Defendants for which Plaintiffs have not received the agreed upon benefits. Further, Defendants will be unjustly enriched by illegally and unlawfully misappropriating Plaintiffs services and work.

80.     If Defendants can retain these benefits without paying Plaintiffs, Defendants will be unjustly enriched in an amount in excess of $75,000, to be determined at trial.

81.     As a direct and proximate result of Defendants' unjust enrichment, as set forth above, Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to an award of reasonable attorneys' fees and costs incurred herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.   For relief as the Court may deem just and proper.

2.   For all costs and all attorneys' fees incurred and accrued in these proceedings.

1    Dated this 28 day of March 2019

2                                          **A.M. SANTOS LAW, CHTD.**

3

4                                          _____
                                           Antony M. Santos, Esq.
5                                          Nevada Bar No. 11265
                                           2620 Regatta Drive Suite 102
6                                          Las Vegas, Nevada 89128
                                           Telephone: (702) 560-2409
7                                          Facsimile: (702) 543-4855
                                           ams@lawlvnv.com
8

9

10

11

12

13

14

15

16

17                              **DEMAND FOR JURY TRIAL**

18        Plaintiffs hereby demand a jury trial on all claims so triable in this action.

19        Dated this 28 day of March 2019

20
                                           **A.M. SANTOS LAW, CHTD.**
21

22                                         _____
                                           Antony M. Santos, Esq.
23                                         Nevada Bar No. 11265
                                           2620 Regatta Drive Suite 102
24                                         Las Vegas, Nevada 89128
                                           Telephone: (702) 560-2409
25                                         Facsimile: (702) 543-4855
                                           tony@amsantoslaw.com
26

27

28